**IN THE UNITED STATES DISTICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(RICHMOND DIVISION)**

| | |
|---|---|
| MAJOR MIKE WEBB, d/b/a FRIENDS )<br>FOR MIKE WEBB, MAJOR MIKE WEBB )<br>FOR U.S. CONGRESS (VA8), MAJOR )<br>MIKE WEBB FOR VA and MAJOR MIKE )<br>WEBB FOR APS BOARD )<br>    **Petitioner,** *Pro Se* )<br>                )<br>     **v.**             )<br>                )<br>ANTHONY S. FAUCI, in official and )<br>individual capacities, NATIONAL )<br>INSTITUTE FOR ALLERGY & )<br>INFECTIOUS DISEASE (NIAID), )<br>ROCHELLE WALENSKY, in official and )<br>individual capacities, CENTERS FOR )<br>DISEASE CONTROL & PREVENTION, )<br>JANET WOODCOCK, in official and )<br>individual capacities, FOOD & DRUG )<br>ADMINISTRATION (FDA), )<br>MOHAMMED NORMAN OLIVER, in )<br>official and individual capacities, )<br>VIRGINIA DEPARTMENT OF HEALTH )<br>(VDH), PFIZER, INC., MODERNATX, )<br>INC., JOHNSON & JOHNSON, INC., )<br>FACEBOOK, INC., TWITTER, INC., )<br>LINKEDIN, UNIVERSITY OF VIRGINIA )<br>DONALD S. BEYER, JR., in official and )<br>individual capacities,  TIMOTHY M. )<br>KAINE, in official and individual capacities )<br>MARK R. WARNER in official and )<br>individual capacities, JUSTIN M. WILSON, )<br>in official and  individual capacities, )<br>DIONNE HARDY, in official and )<br>individual capacities, OFFICE OF )<br>MANAGEMENT AND BUDGET (OMB), )<br>MARK R. HERRING, in official and )<br>individual capacities,  OFFICE OF THE )<br>STATE ATTORNEY GENERAL and )<br>RALPH S. NORTHAM, in Official and )<br>individual capacities )<br>     **Respondents** )  | Civil Action No.<br><br>Demand for Jury Trial |

## PETITION FOR DECLARATORY RELIEF, PRELIMINARY INJUNCTION AND WRIT OF MANDAMUS

1. Petitioner Major Mike Webb, doing business as Friends for Mike Webb, Major Mike Webb for U.S. Congress (VA8), Major Mike Webb for VA and Major Mike Webb for APS Board,  brings a verified complaint against Respondents Anthony S. Fauci, in his official and individual capacities, the National Institute for Allergy and Infectious Disease (NIAID), Rochelle Walensky, in her official and individual capacities, the Centers for Disease Control & Prevention (CDC), Janet Woodcock, in her official and individual capacities,  Food and Drug Administration (FDA), Mohammed Norman Oliver, in his official and individual capacities, Virginia Department of Health, Pfizer, Inc., ModernaTX, Inc., Johnson & Johnson, Inc., Facebook, Inc., Twitter, Inc., LinkedIn, a wholly owned subsidiary of Microsoft, Inc., University of Virginia, Donald S. Beyer, Jr., in his official and individual capacities, Timothy M. Kaine, in his official and individual capacities, Mark R. Warner, in his official and individual capacities, Justin M. Wilson, in his official and individual capacities, Dionne Hardy, in her official and individual capacities, the Office of Management and Budget, Mark R. Herring, in his official and individual capacities, and the Office of the State Attorney General, Ralph S. Northam, in his official and individual capacities, state as follows:

### Jurisdiction: Injunctive Relief

2. Pursuant to 21 U.S.C. § 332(a), "[t]he district courts of the United States and the United States courts of the Territories shall have jurisdiction, for cause shown [1] to restrain violations of section 331 of this title, except paragraphs (h), (i), and (j)", and, pursuant to (b), "[i]n case of violation of an injunction or restraining order issued under this section, which also constitutes a violation of this chapter, trial shall be by the court, or, upon demand of the accused, by a jury."

3. Petitioner brings this action against named Respondents seeking injunctive relief, making jurisdiction proper.

## Jurisdiction: Declaratory Relief

4. Pursuant to 28 U.S.C. § 2201(a),

> In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986, a proceeding under section 505 or 1146 of title 11, or in any civil action involving an antidumping or countervailing duty proceeding regarding a class or kind of merchandise of a free trade area country (as defined in section 516A(f)(9) of the Tariff Act of 1930), as determined by the administering authority, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

5. Pursuant to 28 U.S.C. § 2202, "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

6. Petitioner brings this action against named Respondents seeking declaratory relief, making jurisdiction proper.

## Jurisdiction: *Federal Tort Claims Act (FTCA)*

7. Pursuant to 28 U.S.C. § 2674,

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

8. Pursuant to 28 U.S.C. § 2672,

> The head of each Federal agency or his designee, in accordance with regulations prescribed by the Attorney General, may consider, ascertain, adjust, determine, compromise, and settle any claim for money damages against the United States for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission

occurred: Provided, That any award, compromise, or settlement in excess of $25,000 shall be effected only with the prior written approval of the Attorney General or his designee. Under 28 U.S.C. § 1446(c)(3)(A), "[i]f the case stated by the initial pleading is not removable solely because the amount in controversy does not exceed the amount specified in section 1332(a), information relating to the amount in controversy in the record of the State proceeding, or in responses to discovery, shall be treated as an "other paper" under subsection (b)(3)."

9. Pursuant to 28 U.S.C. § 2677, "[t]he Attorney General or his designee may arbitrate, compromise, or settle any claim cognizable under section 1346(b) of this title, after the commencement of an action thereon", and pursuant to 28 U.S.C. § 2679(a), "[t]he authority of any federal agency to sue and be sued in its own name shall not be construed to authorize suits against such federal agency on claims which are cognizable under section 1346(b) of this title, and the remedies provided by this title in such cases shall be exclusive.

10. Pursuant to 28 U.S.C. § 2679(b)(1),

The remedy against the United States provided by sections 1346(b) and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.

11. Pursuant to 28 U.S.C. § 2679(b)(2), "Paragraph (1) does not extend or apply to a civil action against an employee of the Government. . . (A) which is brought for a violation of the Constitution of the United States, or (B) which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized."

12. Petitioner brings this action against named Respondents seeking injunctive and declaratory relief in redress damages accrued from a tort, not arising under a violation

of the Constitution of the United States, nor a violation of an authorized statute,

making jurisdiction proper.

### Jurisdiction: Section 1983 Claim

13. Pursuant to Under 42 U.S.C. § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

14. Pursuant to 42 U.S.C. § 1988(b), "[i]n any action or proceeding to enforce a provision

of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public

Law 92–318 [20 U.S.C. 1681 *et seq.*], the *Religious Freedom Restoration Act of 1993*

[42 U.S.C. 2000bb *et seq.*], the *Religious Land Use and Institutionalized Persons Act*

*of 2000* [42 U.S.C. 2000cc *et seq.*], title VI of the *Civil Rights Act of 1964* [42 U.S.C.

2000d et seq.], or section 12361 of title 34, the court, in its discretion, may allow the

prevailing party, other than the United States, a reasonable attorney's fee as part of the

costs, except that in any action brought against a judicial officer for an act or omission

taken in such officer's judicial capacity such officer shall not be held liable for any

costs, including attorney's fees, unless such action was clearly in excess of such

officer's jurisdiction.

15. Under Va. Code § 57-2.02(B), "[n]o government entity shall substantially burden a

person's free exercise of religion even if the burden results from a rule of general

applicability unless it demonstrates that application of the burden to the person is (i)

essential to further a compelling governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest."

16. Under Va. Code § 57-2.02(C), "[n]othing in this section shall be construed to (i) authorize any government entity to burden any religious belief or (ii) affect, interpret or in any way address those portions of Article 1, Section 16 of the Constitution of Virginia, the *Virginia Act for Religious Freedom* (§ 57-1 et seq.), and the *First Amendment* to the *United States Constitution* that prohibit laws respecting the establishment of religion."

17. Under Va. Code § 57-2.02(D) "[a] person whose religious exercise has been burdened by government in violation of this section may assert that violation as a claim or defense in any judicial or administrative proceeding and may obtain declaratory and injunctive relief from a circuit court, but shall not obtain monetary damages", and that "[a]person who prevails in any proceeding to enforce this section against a government entity may recover his reasonable costs and attorney fees", in addition to those entitlements authorized under 42 U.S.C. §§ 1983 and 1988.

18. Petitioner raises, in addition to others, claims in redress of violations of the *Establishment* and *Free Exercise Clauses*, invoking the *Religious Freedom Restoration Act*, as well as the *Free Speech* and *Equal Protection Clauses*, making jurisdiction proper.

**Jurisdiction: *Freedom of Information Act (FOIA)***

19. Under 5 U.S.C, § 552(4)(B), "[o]n complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant."

**20.** Under 5 U.S.C. § 552, excepting unusual circumstances, an agency shall make reply to a request for information within twenty (20) days, or, in the alternative, pursuant to 5 U.S.C. § 552(a)(6)(B)(i), "[i]n unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched."

### Jurisdiction: *Racketeering Influenced and Corrupted Organizations (RICO) Act*

**21.** Pursuant to 18 U.S.C. § 1964(c), "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."

**22.** Pursuant to 18 U.S.C. § 1961(3), a "'person' includes any individual or entity capable of holding a legal or beneficial interest in property."

**23.** Pursuant to 18 U.S.C. § 1961(4), an "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity".

**24.** Pursuant to 18 U.S.C. § 1961(4), a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity".

**25.** Describing Petitioner, one local news content provider stated that "a perennial candidate with a colorful history," Jo DeVoe, "Mary Kadera Captures Democratic

School Board Endorsement," *ARL Now*, May 25, 2021, "who has floated around the periphery of the Northern Virginia political scene for nearly the past decade, qualified for the School Board ballot." Staff, "Morning Notes: Candidate Adds Military Rank to His Name," *ARL Now*, June 10, 2021, and, for purposes of the federal racketeering statute, it is sufficient that a plaintiff aver that an "enterprise worked in furtherance of the underlying goal to reelect [a politician] and his political allies", and to aver that "as a result of Defendants retaliation against him for not supporting [a politician] in his bid for reelection, Plaintiff lost his business, thereby causing an injury." *Lopez v. Pastrick*, No. 205-CV-452, 2007 WL 1042140, at *1–6 (N.D. Ind. Apr. 4, 2007).

26. Pursuant to 18 U.S.C. § 1961(4), "[a]n enterprise 'includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity'", *Lopez*, No. 205-CV-452, 2007 WL 1042140, at *1–6, and Petitioner avers that an enterprise, as in evidence at Exhibit **A** and Exhibit **B**, did exist for the purposes of engaging predicate offenses in retaliation against him that resulted in injuries, as detailed below.

27. Additionally, under Va. Code § 18.2-500(A), [a]ny person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefor and recover three-fold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel, and without limiting the generality of the term, 'damages' shall include loss of profits."

## Claims

### *Declaratory Relief*

28. Pursuant to 28 U.S.C. § 2201(a), Petitioner seeks declaratory relief to declare the vaccinations policies an unconstitutional violation of his rights guaranteed under the *First* and *Fourteenth Amendments*, in a challenge, both facial and as applied, as

described below arising from activities in connection with the COVID-19 response
and the vaccination manufacture, distribution and administration therefor.

### *Injunctive Relief*

29. Pursuant to Fed.R.Civ.Pro. 65(a)(1), "[t]he court may issue a preliminary injunction
only on notice to the adverse party", but, pursuant to Fed.R.Civ.Pro. 65(b)(1), "[t]he
court may issue a temporary restraining order without written or oral notice to the
adverse party or its attorney only if:

> (A) specific facts in *an affidavit or a verified complaint* clearly show that
> immediate and irreparable injury, loss, or damage will result to the movant
> before the adverse party can be heard in opposition; and

> (B) the movant's attorney certifies in writing any efforts made to give notice
> and the reasons why it should not be required. (emphasis added)

### *Enjoining Advertising and Messaging*

30. The case fatality rate for COVID-19 is only 1.8%[1], belying claims that "[t]he COVID-
19 pandemic isn't over yet, as the new Delta variant threatens vulnerable
communities—and vulnerable people, like unvaccinated children, who are getting
sicker and sicker." Alek Korab, "Dr. Fauci Warns of Infections After Vaccination,"
*MSN News*, July 1, 2021.

---

[1] It is a fact that, with a total of 33,470,212 cases of infection attributed to 601,808 fatalities, Staff, "
Vaccination and Case Trends of COVID-19 in the United States," *CDC*, June 29, 2021,
https://covid.cdc.gov/covid-data-tracker/#vaccinations-cases-trends (accessed June 29, 2021), the case
fatality rate is only 1.8%, *see also* Hiroshi Nishiura, *Case fatality ratio of pandemic influenza*, 10 The
Lancet 7, pp. P443-444, July 1, 2010, while, during the Spanish Flu Pandemic, "[c]ase-fatality rates were
>2.5%," Jeffery K. Taubenberger & David M. Morens, *1918 Influenza: the Mother of All Pandemics*, 12
Emerg. Inf. Dis. 1, pp. 15-22, https://doi.org/10.3201/eid1201.050979, widely known to exhibit a suspect
highly variable case fatality rate, based upon location, Moira Chan-Yeung &  Rui-Heng Xu, *SARS:
Epidemiology*, 8 Respirology (Supplement), pp. S9-S14 (2003), doi:10.1046/j.1440-1843.2003.00518.x[1],
and some have found a case fatality rate as high as 28%, *see* Amit Aggarwal, *et al.*, *Clinical and
Epidemiological Features of SARS-CoV-2 Patients in SARI Ward of a Tertiary Care Centre in New Delhi*,
68 J. Assoc. Phys. India 7, pp. 19-26 (July 2020) (28%); as high as yellow fever,  Joseph L, Servadio, *et al.*,
"Estimating Case Fatality Risk for Severe Yellow Fever Cases: A Systematized Review and Meta-
Analysis," *U. Minn. Sch. Pub. Health*, https://www.sph.umn.edu/sph-2018/wp-
content/uploads/2020/05/rd2020-joseph-servadio.pdf (accessed May 10, 2021).

31. Similar to the Attorney General for the State of Missouri, in *State of Missouri v. Bakker*, Case No. 20SN-CC00084 (Stone Cy. Cir. 2021), where defendants were enjoined from "advertising or selling Silver Solution to diagnose, prevent, mitigate, treat or cure any disease or illness," Petitioner brings an action to enjoin Respondents Food and Drug Administration (FDA), Centers for Disease Control & Prevention (CDC), Virginia Department of Health (VDH), Pfizer, Inc., ModernaTX, Inc. and Johnson & Johnson, Inc. from promoting the COVID-19 vaccines as "effective", on grounds that when approved under the *Emergency Use Authorization* the three-stage clinical trials set out parameters to establish "efficacy and safety", which is wholly distinct from "effectiveness", in clinical terms, and that "[j]udicial review of agency action. . . is limited to 'the grounds that the agency invoked when it took the action,'" *DHS v. Regents of the University of California*, 591 U.S. ___ (2020) (quoting from *Michigan v. EPA*, 576 U. S. 743 (2015)), and in references to COVID-19 as a "highly contagious" or "highly infectious" disease, for which it has not been clinically or empirically validated.

32. In the Commonwealth of Virginia, and in other jurisdictions,

> "A party alleging fraud must prove by clear and convincing evidence (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to him. *Winn v. Aleda Constr. Co.*, 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984). Clear and convincing evidence is such proof as will establish in the trier of fact a firm belief or conviction concerning the allegations that must be established. *Walker Agency, Inc. v. Lucas*, 215 Va. 535, 540-41, 211 S.E.2d 88, 92 (1975)." *Thompson v. Bacon*, 245 Va. 107, 425 S.E.2d 512 (1993).

33. In clinical literature,  succinctly stated, "[v]accine efficacy is defined as a relative reduction in influenza risk after vaccination, determined by a randomised controlled

trial (RCT)"[2], "[e]ffectiveness denotes a relative reduction in odds of influenza associated with vaccination in an observational study" and "[i]mmunogenicity is the immune response to influenza vaccination", and factors such as efficacy and immunogenicity may or may not be universally transferable to different populations or geographic regions, and may require, "for example, the use of high-dose or adjuvanted[3] vaccines", targeted to specific populations. Benjamin B. Lindsey, *et al.*, *The efficacy, effectiveness, and immunogenicity of influenza vaccines in Africa: a systematic review*, 19 The Lancet 4, pp. E110-E119, April 1, 2019 (published December 12, 2018), DOI:https://doi.org/10.1016/S1473-3099(18)30490-0. *See also generally* Farzaneh Sanei & Tom Wilkinson, *Influenza vaccination for patients with chronic obstructive pulmonary disease: understanding immunogenicity, efficacy and effectiveness*, 10 Ther. Adv. Respir. Dis. 4, pp. 349-367 (2016), *epublished* May 18, 2016, DOI: 10.1177/1753465816646050; Mohammad Bosaeed & Deepali Kuma, *Seasonal influenza vaccine in immunocompromised persons*, 14 Human Vac. & Immunotherapeutics 6, pp. 1311–1322 (2018), https://doi.org/10.1080/21645515.2018.144544.

**34.** Vaccine messaging that attempts to present efficacy and effectiveness is, clinically, a misrepresentation of a material fact.

---

[2] *But see* Staff, "COVID-19 vaccine efficacy summary," *IHME*, June 4, 2021, http://www.healthdata.org/covid/covid-19-vaccine-efficacy-summary (accessed June 28, 2021) (defining "prevention of symptomatic disease" as "a vaccine's efficacy at causing an exposed individual not to suffer the symptoms of COVID-19 infection", wherein "[t]he person can contract the virus but will not develop disease", "prevention of severe disease" as " a vaccine's efficacy at preventing an exposed person from developing more serious symptoms that often require hospitalization" and "prevention of infection as "a vaccine's efficacy at stopping transmission of the virus from one person to another", wherein "[a]n exposed person will not contract the virus, and by definition they will also not develop symptoms or disease.").

[3] "A substance added to a drug product formulation that affects the action of the active ingredient in a predictable way" or "a vehicle used to enhance antigenicity; for example, a suspension of minerals (alum, aluminum hydroxide or phosphate) on which antigen is adsorbed; or water-in-oil emulsion in which antigen solution is emulsified in mineral oil (Freund incomplete adjuvant), sometimes with the inclusion of killed mycobacteria (Freund complete adjuvant) to enhance antigenicity further (inhibits degradation of antigen and/or causes influx of macrophages)." Staff, "Adjuvant" *The Free Dictionary*, https://medical-dictionary.thefreedictionary.com/adjuvant (accessed June 29, 2021).

35. Vaccine messaging that attempts to present efficacy and effectiveness by

pharmaceutical companies and government agencies credited as experts in the field,

particularly in the Commonwealth where "'[m]eans of knowledge, with the duty of

using them, are, in equity, equivalent to knowledge itself'", *Kian v. Kefalogiannis*,

158 Va. 129, 163 S.E. 535 (1932) (quoting *Cordova v. Hood*, 84 U.S. 1, 21 L. Ed.

587, 17 Wall. 1, 1872 U.S. LEXIS 1304 (1873), is a misrepresentation made

intentionally and knowingly with an intent to mislead, and which has, to date, placed

at least 70% of Virginia residents who have volunteered for at least the first dose,

Governor of VA, "Last week, Virginia became the 16th state to vaccinate 70% of

adults. . ." *Facebook*, June 29, 2021,

https://www.facebook.com/GovernorVA/photos/a.10150146963196095/10159709547

631095/ (accessed July 1, 2021), and 66.5% of American adults who have received at

least the first dose of the COVID-19 vaccines, Staff, "COVID Data Tracker:

Demographic Characteristics of People Receiving COVID-19 Vaccinations in the

United States," *CDC*, July 1, 2021, https://covid.cdc.gov/covid-data-

tracker/#vaccination-demographic (accessed July 1, 2021) in detrimental reliance,

spurred on by messaging where they may have heard "immunity", unaware that "herd

effect" was the goal confused in the press, despite being a distinction made two

decades ago, and were apparently deafened to the sound of "defense" in the *Defense

Production Act*, which like the *Emergency Use Authorization*, cannot be used to

address a communicable disease, and would have been required to be a biological

agent being deployed against a target of national security interest, consistent with the

pathology of a less than five percent infectious pathogen that had attained pandemic

status.

### *Enjoining Compulsory Student Vaccinations*

**36.** Additionally, Petitioner, is currently a student at the John Leland Center for

Theological Studies in Arlington, Virginia, enrolled in a graduate certificate program

for Christian Leadership, but is intending to transfer to the Virginia Center for the

Study of Religion at the University of Virginia, but not for a recent announcement in

the press:

> The University of Virginia will require students who live, learn or work on
> campus this fall to be vaccinated against the coronavirus, school officials
> announced Thursday.
>
> The order applies to the student body of about 25,000, with the exception of
> students with medical or religious excuses. Faculty and staff are encouraged to
> get their shots, but those who do not will have to undergo regular testing,
> officials said. Lauren Lumpkin, "University of Virginia to mandate
> coronavirus vaccines for students," *Washington Post*, May 20, 2021.

**37.** Neither the President nor the Governor nor the Commonwealth has made COVID-19

vaccinations compulsory, despite an alleged authority under *Jacobson v*

*Massachusetts*, 197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905) to do so, but,

distinguished from the facts in that seminal case, which stated "if a statute purporting

to have been enacted to protect the public health, the public morals, or the public

safety has no real or substantial relation to those objects, or is, beyond all question, a

plain, palpable invasion of rights secured by the fundamental law, it is the duty of the

courts to so adjudge, and thereby give effect to the Constitution," the subject pathogen

was small pox, a validate 60% infectious pathogen, Staff, "Transmission," *CDC*,

December 5, 2016, https://www.cdc.gov/smallpox/clinicians/transmission.html

(accessed August 25, 2020), hence a "highly contagious" pathogen, while COVID-19

has been consistently validated as less than five percent infectious, during the largest

sample size tracer contacts study conducted prior to the Governor's COVID-19

response in the Commonwealth, a study involving almost 56,000 laboratory

confirmed cases and their tracer contacts, WHO, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, dated February 18-24, 2020, as well as in the largest sample size tracer contacts study, to date, involving over three million laboratory confirmed cases in India, which found only a secondary attack rate of 4.6%. Ramanan Laxminaraya, *Epidemiology and transmission dynamics of COVID-19 in two Indian states*, Science 370, pp. 691-697, (2020), four times too low to validate the presence of an infectious disease, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)* ("it is not clear whether this correlates with the presence of infectious virus"); *see also* Julia Belluz, "China's cases of Covid-19 are finally declining. A WHO expert explains why," *Vox Media*, March 2, 2020, *updated* March 3, 2020, and 12 times too low to set off a super spreader event. Martin J. Blaser & Lee S. Newman, *A Review of Human Salmonellosis: I. Infective Dose*, 4 Reviews of Infectious Diseases 6, pp. 1096–1106 (November 1982), https://doi.org/10.1093/clinids/4.6.1096.

38. A recent study on COVID-19 reinfections, examining 150,325 people tested in two states, Ohio and Florida, in one healthcare system, finding only a 4.9% chance of reinfection within ten months, characterized that risk as "rare." Sheehan *et al.*, *Reinfection Rates among Patients who Previously Tested Positive for COVID-19: a Retrospective Cohort Study*, Clinical Infectious Diseases, March 15, 2021, https://ncrc.jhsph.edu/research/reinfection-rates-among-patients-who-previously-tested-positive-for-covid-19-a-retrospective-cohort-study/ (accessed June 28, 2021); Megan M. Sheehan, Anita J. Reddy & Michael B. Rothberg, *Reinfection Rates Among Patients Who Previously Tested Positive for Coronavirus Disease 2019: A Retrospective Cohort Study*, Clinical Infectious Diseases, March 15, 2021, ciab234, https://doi.org/10.1093/cid/ciab234.

**39.** "Virginia's state of emergency - declared over a year ago as the pandemic was gaining momentum - expires this week", Joe Dashielli, "COVID state of emergency expiring in Virginia," *NBC12*, June 29, 2021, and Respondent Virginia Department of Health has, in at least acquiescence, conceded that the declaration regarding a communicable disease of public health threat was made one month before the first confirmed case of COVID-19 was reported in any "affected area" in the Commonwealth, Jeremy M. Lazarus, "Faces of leadership: Virginia Health Commissioner M. Norman Oliver is on front line of fight," *Richmond Free Press*, March 26, 2020, updated March 27, 2020 ("On Feb. 7, a month before the first case of coronavirus was diagnosed in Virginia, Dr. Oliver declared the virus a public health threat"), a requirement under the controlling statute, Va. Code § 44-146.17 (Effective until March 1, 2021), which provides, in relevant part, that the Governor's authority regarding executive orders is not plenary, and "[s]uch executive orders declaring a state of emergency may address exceptional circumstances that exist relating to an order of quarantine or an order of isolation concerning a *communicable disease of public health threat* that is issued by the State Health Commissioner *for an affected area* of the Commonwealth pursuant to Article 3.02 (§ 32.1-48.05 et seq.) of Chapter 2 of Title 32.1." (emphasis added)

**40.** From this contention, Respondent Virginia Department of Health and the Governor have successfully evaded the service of a summons, and sought to dismiss an action raising this claim, since April 2, 2020, when the action was commenced. *Webb v. Northam*, Case Number CL20001624 (Alexandria Cir. 2020).

**41.** State and local agencies have marketed the idea that consenting to administration of the COVID-19 vaccine provides safety for those who consent, creating a safe work environment, *see for example* Staff, "COVID-19 Vaccines Now Available for Children 12-15 yrs old," *APS*, May 13, 2021 (video of a three-day event intending to administer

vaccines to one thousand teachers, administrators and staff), a fraudulent misrepresentation of the characteristics for which the vaccines have been approved, or could deliver with no knowledge of the infectious dose.

42. Under *Johnston v. Wood & Assocs.*, Record No. 151160 (Va. 2016), while in an at-will employment arrangement "either party is ordinarily at liberty to terminate it at-will on giving reasonable notice of his intention to do so." *Stonega Coal & Coke Co. v. Louisville & Nashville R.R. Co.*, 106 Va. 223, 55 S.E. 551 (1906), the request to consent to noncompulsory vaccines as a condition for work constitutes "effective notice that the employment relationship has ended", *Johnston*, Record No. 151160, an offer, in *quid pro quo*, that cannot be refused, rendering all interactions thereafter in the context of a "discriminatorily hostile or abusive environment. Citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986) (quoting *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, n. 13 (1978))[4], in abridgement of an employee's or student's *free exercise* right, in furtherance of a violation of the *Establishment Clause*, and in rejection of the rule that "[w]hatever the power of the state to control public dissemination of ideas inimical to the public morality, it cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts." *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). *See also West Virginia State Bd. of Educ. v. Barnett*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.")

### *Enjoining Disparate Treatment*

---

[4] "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' 477 U. S., at 65, that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' *id.*, at 67 (internal brackets and quotation marks omitted), Title VII is violated." *Id.*

43. "Spain lifted its COVID-19 vaccination mandate for U.S. visitors on June 24, paving the way for all Americans to visit without needing to test or quarantine", Meena Thiruvengadam, "Spain Waives Vaccination Requirement for U.S. Travelers," *MSN News*, July 1, 2021; however, according to national public health guidance and orders, "[i]f you are fully vaccinated, you can resume activities that you did prior to the pandemic", and "*[f]ully vaccinated people can resume activities without wearing a mask* or physically distancing, except where required by federal, state, local, tribal, or territorial laws, rules, and regulations, including local business and workplace guidance." Staff, "When You've Been Fully Vaccinated: How to Protect Yourself and Others," *CDC*, June 17, 2021, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated.html. (emphasis added)

44. Clarifying national guidance, according to recent news reports, "Centers for Disease Control and Prevention (CDC) Director Dr. Rochelle Walensky said Wednesday that most Americans vaccinated against COVID-19 should feel comfortable going without a mask but noted that everyone should continue to follow guidance from their local health departments." Alex Hider, "CDC clarifies: Those vaccinated can go without masks unless local health officials say otherwise," *KSHB*, June 30, 2021, *updated* July 1, 2021.

45. However, with regard to the faith community and places of worship, national public health guidance, as of February states that "[i]n the event a person diagnosed with COVID-19 is determined to have been in the building and poses a risk to the community, it is strongly suggested to dismiss attendees, then properly clean and disinfect the area and the building where the individual was present before resuming activities", Staff, "Considerations for Communities of Faith," *CDC*, February 19, 2021, https://www.cdc.gov/coronavirus/2019-ncov/community/faith-based.html (accessed July

1, 2021), even though a less than five percent infectious pathogen is not an infectious disease.

**46.** Recent guidance to the faith community is inaccessible on the provide link, but the press release states that:

> Gathering together for worship is at the heart of many faith traditions. Because there are several published reports of COVID-19 outbreaks sparked by large gatherings, both non-religious and religious in nature, the recommendations released today will help guide faith communities while respecting their fundamental right to gather for worship. Staff, "Press Release: CDC Releases Recommendations for Communities of Faith," *CDC*, May 22, 2021, https://www.cdc.gov/media/releases/2020/s0522-cdc-releases-recommendations-faith.html (accessed July 1, 2021).

**47.** On the local level, in the Commonwealth, specific guidance states that:

> Encourage all community members to get vaccinated for COVID-19 by going to Vaccinate.Virginia.gov or calling 1-877-VAX-IN-VA.
>
> Faith-based organizations should consider following VDH Recommendations for Businesses and other Establishments for guidance on masking, distancing, and cleaning.
>
> Individuals should consider their personal risk of COVID-19 before attending an in-person worship service. Attending an indoor service, including services with singing, is generally considered safe for someone who is fully vaccinated, but considered least safe for someone who is not vaccinated. CDC's Choosing Safer Activities guide can help individuals make safer choices and also help determine when masking and distancing is appropriate. Staff, "Faith Based Organizations," *VDH*, https://www.vdh.virginia.gov/coronavirus/schools-workplaces-community-locations/faith-based-organizations/ (accessed July 1, 2021).

**48.** Additional guidance states, regarding masking, that:

> For unvaccinated individuals, outdoor gatherings are safer than indoor gatherings. Gatherings in large, well-ventilated spaces are safer than gatherings in smaller spaces that are not well-ventilated, especially when unvaccinated individuals take all precautions, such as distancing and mask wearing. *Id.*

**49.** Moreover, guidance from the Commonwealth states that "[f]or unvaccinated individuals, if other unvaccinated guests are not masking or distancing, then the risk of COVID-19 spread is higher."

**50.** Yet, as stated above, neither the largest sample size tracer contacts study before the lockdowns in the Commonwealth, *see Joint Mission*, nor the largest sample size tracer

contacts study to date, *see India*, have validated COVID-19 as a communicable disease being transmitted from person to person, a proscribed contingency for application under both the *Emergency Use Authorization* and the *Defense Production Act*.

51. Moreover, a decade ago, utilizing the same equipment used to rate the N95 and other medical grade personal protective equipment, the National Institute for Occupational Safety and Health definitively determined with regard to nonmedical grade substitutes that "[t]he penetration levels of these fabric materials against both polydisperse and monodisperse aerosols were *much higher than the penetrations for the control N95 respirator filter media*" and concluded that "[r]esults obtained in the study show that common fabric materials may provide [at most] marginal protection against nanoparticles including those in the size ranges of virus-containing particles in exhaled breath. Samy Rengasamy, *et al.*, *Simple Respiratory Protection—Evaluation of the Filtration Performance of Cloth Masks and Common Fabric Materials Against 20–1000 nm Size Particles*, 54 Ann. Occup. Hyg. 7, pp. 789–798 (2010). *See also* Ben Guarino, Chelsea Janes & Ariana Eunjung Cha, "Spate of new research supports wearing masks to control coronavirus spread," *Washington Post*, June 13, 2020[5].

52. Accordingly, unvaccinated persons in a worship service are compelled by the government to engage in disparate treatment against congregants similarly situated with no rational basis to justify the discrimination, and in furtherance of a policy that could not, under any circumstances, be determined to be a legitimate state interest.

---

[5] "'Our findings suggest, in multiple ways, that the use of masks is highly protective in health-care and community settings,' said the author of the review, Holger Schünemann, an epidemiologist and physician at McMaster University in Ontario.

But that conclusion came with an important *caveat*: 'We have low certainty in that,' Schünemann said, meaning the authors cannot be strongly conf'ident in the result." *Id.*

**53.** Under a strict scrutiny analysis, *Gray v. Commonwealth*, 274 Va. 290 (2007)[6], it is of note that, despite an acknowledgment of the low risk from fomite transmission, or indirect infection from contaminated surfaces, in early April, *see* Audrey Conklin, "CDC: There's 1-in-10,000 chance of getting COVID from surfaces," *Fox News*, April 6, 2021, guidance to the faith community published in February, Staff, "Considerations for Communities of Faith," *supra*, was not updated until May, per press release, *see* which appears to still be unavailable on the official website for the Centers for Disease Control & Prevention, requiring places of worship to refrain from even collecting offerings, or sharing common materials.

*Enjoining Manufacture and Distribution*

**54.** Under the Federal Acquisition Regulation (FAR) §1.602-1(a), "[c]ontracting officers have authority to enter into, administer, or terminate contracts and make related determinations and findings", and they "may bind the Government only to the extent of the authority delegated to them", and "shall receive from the appointing authority (*see* 1.603-1) clear instructions in writing regarding the limits of their authority." Moreover, pursuant to FAR § 1.602-1(b), "[n]o contract shall be entered into unless the contracting officer ensures that all requirements of law, executive orders, regulations, and all other applicable procedures, including clearances and approvals, have been met." Furthermore, an "unauthorized commitment" is defined as "an agreement that is not binding solely because the Government representative who made it lacked the authority to enter into that agreement on behalf of the Government." FAR § 1.602-3.

---

[6] "A statute challenged on equal protection grounds is evaluated under 'strict scrutiny' if it interferes with a 'fundamental right' or discriminates against a 'suspect class. *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 457-58, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988); *see also Hess v. Snyder Hunt Corp.*, 240 Va. 49, 55, 392 S.E.2d 817, 821 (1990).   Otherwise, a statute will ordinarily survive an equal protection challenge if 'the challenged classification is rationally related to a legitimate governmental purpose.' *Kadrmas*, 487 U.S. at 458, 108 S.Ct. 2481 ('rational basis' test); *see also Hess*, 240 Va. at 55, 392 S.E.2d at 821."

**55.** As of June 18, 2021, 5,933 fatalities have been associated with the vaccines, within

4,108,664 adverse events, with the most common adverse event recorded as pyrexia

(172,649) nationally. United States Department of Health and Human Services (DHHS),

Public Health Service (PHS), Centers for Disease Control (CDC) / Food and Drug

Administration (FDA), "Vaccine Adverse Event Reporting System (VAERS) 1990 -

06/18/2021," *CDC WONDER On-line Database*, http://wonder.cdc.gov/vaers.html

(accessed  July 1, 2021).

**56.** As of June 18, 2021, in the Commonwealth, 101 fatalities have been associated with the

vaccines, within 115,880 adverse events, with the most common adverse event recorded

as pyrexia (4,680). United States Department of Health and Human Services (DHHS),

Public Health Service (PHS), Centers for Disease Control (CDC) / Food and Drug

Administration (FDA), "Vaccine Adverse Event Reporting System (VAERS) 1990 -

06/18/2021," *CDC WONDER On-line Database*, http://wonder.cdc.gov/vaers.html

(accessed  July 1, 2021).

**57.** According to recent news reports:

> The US Food and Drug Administration added a warning about the risk of myocarditis
> and pericarditis to fact sheets for Moderna and Pfizer-BioNTech Covid-19 vaccines
> Friday.
>
> The warning notes that reports of adverse events following vaccination — particularly
> after the second dose — suggest increased risks of both types of heart inflammation,
> CNN reports.
>
> Earlier this week, vaccine advisers to the US Centers for Disease Control and
> Prevention heard that the agency had received about 1,200 reports of such heart
> inflammation after 300 million doses of the two vaccines had been given. CDC has
> confirmed about 300 of those cases, many of them among young men and
> adolescents.  Lauren Mascarenhas, "FDA adds a warning to Covid-19 vaccines about
> risk of heart inflammation," *CNN*, June 26, 2021; CNN, "FDA adds warning about
> heart inflammation risk to COVID-19 vaccines," *NBC2*, June 29, 2021.

**58.** According to federal authorities, "the *Public Readiness and Emergency Preparedness Act*

*(PREP Act)* provides immunity to qualified individuals", and  a "*PREP Act* Declaration

amendments preempt requirements that would result in a qualified person being unable to prescribe, dispense, or administer vaccines as authorized by the state or U.S. territory", while "provides for a Countermeasure Injury Compensation Program for certain individuals who sustain serious injuries or die from receiving the countermeasures." U.S. Department of Health & Human Services (HHS), "PREP Act Immunity from Liability for COVID-19 Vaccinators," *PHE*, April 13, 2021,

https://www.phe.gov/emergency/events/COVID19/COVIDvaccinators/Pages/PREP-Act-Immunity-from-Liability-for-COVID-19-Vaccinators.aspx (accessed April 28, 2021).

59. Moreover, under the terms of the *PREP Act*, "[w]hen the Secretary determines that a threat or condition constitutes a present or credible risk of a future public health emergency, the Secretary may issue a PREP Act declaration", and "[t]he declaration provides *immunity from liability (except for willful misconduct) for claims of loss* caused by, arising out of, relating to, *or resulting from the administration or use* of covered countermeasures to diseases, threats and conditions identified in the declaration." *Id.* (emphasis added)

60. In the Commonwealth, under the jurisprudence of products liability, "[t]he manufacturer of a chattel will be subject to liability when he (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous. *Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949, 252 S.E.2d 358 (1979) (citing *Restatement (Second) of Torts* § 388 (1965)).

61. Furthermore, as observed in *Jones v. Meat Packers Equip. Co.*, 723 F.2d 370 (1983), in the Commonwealth,

a manufacturer's duty to warn about dangers associated with a product's use is governed by § 388 of the *Restatement (Second) of Torts* (1965). *See Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949, 962, 252 S.E.2d 358, 366 (1979). We have previously concluded that Virginia law includes comment n of § 388, "Warnings given to third person." *See Barnes v. Litton Indus. Products, Inc.*, 555 F.2d 1184, 1188 (4th Cir.1977). Comment n discusses various factors that determine whether giving a warning to a third person is sufficient to relieve the supplier of liability. These include the reliability of the third person as a conduit of the information and the magnitude of the risk compared with the burden imposed on the supplier by requiring that he directly warn all users. *See Russell v. G.A.F. Corp.*, 422 A.2d 989, 992–93 (D.C.1980).

**62.** According to news sources, minimizing the risk[7]:

> The cases, which total 226 people, *or about 0.00015% of the 141 million fully vaccinated American adults*, have occurred mainly in younger people below the age of 30 after they received their second dose of an mRNA vaccine, which would include either the Moderna or Pfizer shot, according to data from the CDC and NBC News.

> Since April 2021, there have been increased reports to the Vaccine Adverse Event Reporting System (VAERS) of cases of inflammation of the heart happening after mRNA COVID-19 vaccination (Pfizer-BioNTech and Moderna) in the United States.

> *It was still too early to determine whether those cases were caused by the vaccine or another factor.*

> *Many things can cause heart inflammation.* Common causes include viral or bacterial infections, such as the coronavirus itself, as well as medical conditions that damage the heart and cause inflammation. Vanessa Ruffes & (WCNC), James Brierton (WCNC), "CDC investigating 200+ cases of heart inflammation after COVID-19 vaccine," *KHOU*, May 27, 2021, *updated* June 11, 2021 (emphasis added).

> *But see* Mollie Mansfield, "RARE JAB RISK More than 280 teens & young men suffer heart inflammation after Pfizer or Moderna Covid jab – sparking CDC 'emergency'," *The Sun (U.S.)*, June 11, 2021[8]; Melissa Jenco, "CDC confirms 226

---

[7] "Swelling of the heart appears to be a very rare side effect that primarily strikes young people after vaccination for COVID-19, a CDC expert reported Thursday, detailing data on cases of myocarditis and pericarditis found through a government safety system.

The side effect seems to be more common in teen boys and young men than in older adults and women and may occur in 16 cases for every 1 million people who got a second dose, said Tom Shimabukuro, MD, deputy director of the CDC's Immunization Safety Office, who presented information on the cases to an expert panel that advises the FDA on vaccines." Brenda Goodman, "Evidence Ties COVID Vaccines to Heart Issue in Youth," *Web MD*, June 11, 2021.

[8] "'We clearly have an imbalance there,' Dr. Tom Shimabukuro, deputy director of the CDC's Immunization Safety Office, said on Thursday.

The overwhelming majority of the cases have occurred within a week of vaccination, Shimabukuro said.

*There were 283 observed cases of heart inflammation after the second vaccine dose in those aged 16 to 24 in the VAERS data.*

cases of myocarditis after COVID-19 vaccination in people 30 and under," *AAP News*, June 10, 2021[9].

**63.** Yet, it is clear that a total of only 41 cases by January 14, 2020, regarding a pneumonia of unknown etiology, with no fatalities, Staff, "Archived: WHO Timeline - COVID-19," WHO, April 27, 2020, https://www.who.int/news/item/27-04-2020-who-timeline---covid-19 (accessed January 15, 2020), with a total of only less than 27 linked to the Huanan Wholesale Seafood Market, in Wuhan, Mandy Zuo, *et al.*, "Hong Kong takes emergency measures as mystery 'pneumonia' infects dozens in China's Wuhan city," *South China Morning Post*, December 31, 2019 ("Over the past month, 27 patients in Wuhan – most of them stall holders at the Huanan seafood market. . ."); *but see* Amanda Woods, "Shrimp vendor at Wuhan market may be coronavirus 'patient zero'," *New York Post*, March 27, 2020 ("A Dec. 31 statement from the Wuhan Municipal Health Commission revealed that Wei was among the first 27 patients to test positive for COVID-19, and one of 24 cases with direct links to the seafood market.")[10], in "a scruffy complex of 1,000 stalls spread over an area the size of nine football fields, . . .the largest of its kind in central China, mostly supplying seafood to Wuhan's residents and restaurants", where, later, only a total of 33 out of 585 environmental samples were collected that indicated the presence of

---

That compares with expectations of 10-to-102 cases for that age range based on US population background incidence rates, the CDC said." *Id.* (emphasis added)

[9] "*Zeroing in on the 475 people ages 30 and under reporting myocarditis or pericarditis to the Vaccine Adverse Event Reporting System (VAERS)*, the most common symptoms were chest pain, elevated cardiac enzymes, ST or T wave changes, dyspnea and abnormal echocardiography/imaging.

*Among 285 cases with a known outcome, 270 were discharged*, most to their homes. About 81% have made a full recovery, and the rest had ongoing symptoms or unknown status. Fifteen are still hospitalized, including three in intensive care.

*There were 79 cases of myocarditis/pericarditis reported in teens ages 16 or 17 years after a second dose of vaccine, while the expected number was two to 19 cases, according to Dr. Shimabukuro. There were 196 cases in young adults ages 18-24 years, while eight to 83 were expected. The case rates per million doses for those age groups were 35 and 21, respectively*." *Id.* (emphasis added)

[10] Upon the date of the first identified case of infection aboard the *U.S.S Theodore Roosevelt*, the territorial possession island of Guam, had a total of only 27 cases, while reporting their first fatality, a women aged 68, with underlying medical issues. *Daily Post Staff*, "1 death, 27 total cases," The Guam Daily Post, March 23, 2020.

coronavirus disease 2019 (COVID-19), Jeremy Page, "Virus Sparks Soul-Searching Over China's Wild Animal Trade," *Wall Street Journal*, January 26, 2020, in the largest city in the central mainland, Maggie Hiufu Wong, "Wuhan: Inside the Chinese city at the center of the coronavirus outbreak," *CNN*, January 23, 2020 ("With a population of more than 11 million people according to government figures, Wuhan is the capital city of Hubei province and the biggest city in China's central region."), and 42nd largest city in the world, Staff, "Wuhan: The London-sized city where the virus began," *BBC*, January 23, 2020[11], resulted in an alert to world public health authorities and sharing of the genetic sequence around the world by January 12, 2020. Staff, "Archived: WHO Timeline - COVID-19," *supra. But see* Karen Weintraub & Elizabeth Weise, "Deleted gene sequences confirm coronavirus circulated before Wuhan seafood market," *USA Today*, June 26, 2021.

**64.** "Since April 2021, increased cases of myocarditis and pericarditis have been reported in the United States after mRNA COVID-19 vaccination (Pfizer-BioNTech and Moderna), particularly in adolescents and young adults", Staff, "Clinical Considerations: Myocarditis and Pericarditis after Receipt of mRNA COVID-19 Vaccines Among Adolescents and Young Adults," *CDC*, May 28, 2021, https://www.cdc.gov/vaccines/covid-19/clinical-considerations/myocarditis.html (accessed June 27, 2021), and, even though recovered cache pages indicate that this risk was known as early as February 11, 2020, as in evidence at Exhibit **C**; *but see* Alexander Tin, "CDC plans meeting on rare heart inflammation following COVID-19 vaccines,"

---

[11] "Wuhan is the provincial capital of Hubei Province and the fifth largest city in China. Its name comes from 'the three towns of Wuhan' – Wuchang, Hankou, and Hanyang. The Triple Cities of China's Heartland are known as "Wuhan." Wuchang and Hankow are known to Westerners as the "Twin Cities of China," comparable to Saint Paul and Minneapolis of the United States. Hanyang. the third city of the Triple Cities is not so well known. Wuchang was the political, educational and cultural center; Hankou was the transportation hub and commerce and trade center; and Hanyang was the cradle of China's modern industry." Staff, "Wuhan," *Global Security*, https://www.globalsecurity.org/military/world/china/wuhan-city.htm (accessed June 27, 2021).

*CBS News*, June 14, 2021[12], "[i]n honor of Juneteenth", it was reported that the "CDC's emergency[13] meeting that was to be held June 18, called only 7 days ago to deal with bad news, was peremptorily cancelled today, at the 11th hour", Meryl Naas, "CANCELLED: CDC's Emergency Advisory Committee meeting tomorrow to consider myocarditis and giving Covid vaccines to our youth," *AllTheNews*, June 17, 2021,

> Data on individuals aged 18 years old and under suggest that there is a relatively low attack rate in this age group (2.4% of all reported cases). Within Wuhan, among testing of ILI samples, no children were positive in November and December of 2019 and in the first two weeks of January 2020. From available data, and in the absence of results from serologic studies, it is not possible to determine the extent of infection among children, what role children play in transmission, whether children are less susceptible or if they present differently clinically (i.e. generally milder presentations). The Joint Mission learned that infected children have largely been identified through contact tracing in households of adults. Of note, people interviewed by the Joint Mission Team could not recall episodes in which transmission occurred from a child to an adult.

**65.** According to one medical news content provider:

> The issue of myocarditis weighed heavily on the Vaccines and Related Biological Products Advisory Committee's considerations of what kind and how much data might be needed to green-light use of a vaccine for COVID in children.
>
> *Because the rates of hospitalization for COVID are low in kids, some felt that the FDA should require at least a year of study of the vaccines in clinical trials*, the amount of data typically required for full approval, instead of the 2 months currently required for emergency use authorization. Others wondered whether the risks of vaccination — as low as they are — might outweigh the benefits in this age groupBrenda Goodman, "Evidence Ties COVID Vaccines to Heart Issue in Youth," *Web MD*, June 11, 2021.

---

[12] "*The new details about myocarditis and pericarditis emerged first in presentations to a panel of independent advisers for the Food and Drug Administration*, who are meeting Thursday to discuss how the regulator should approach emergency use authorization for using COVID-19 vaccines in younger children.

After earning an emergency use authorization for its COVID-19 vaccine in Americans as young as 12 last month, Pfizer announced this week it had decided on doses to use in a clinical trial in children as young as 6 months old and hoped to submit data by October. Moderna said Thursday that it too had requested the FDA's permission to give its mRNA vaccine to adolescents.

While Pfizer has said they expect to wrap up trials for children as young as 2 by September, FDA officials have previously cautioned that authorizing vaccines for these age groups could take longer — "mid to late fall" at the earliest — citing the additional follow-up data needed for children after they receive the shots." *Id.* (emphasis added)

[13] "The CDC first described the panel's session as an 'emergency meeting,' but later changed it to merely a 'COVID-19 meeting.' Previous times the advisors convened to discuss the pandemic — like their May 12th gathering to mull recommendations for Pfizer's COVID-19 vaccine in adolescents — were also described as 'emergency meetings.'"

66. Low rates of hospitalization were considered to be sufficient justification to delay for a
    year a study on the myocarditis risk, *ibid.*, but with only one fatality in the
    Commonwealth, Scott Wise, "A timeline of the COVID-19 pandemic in Virginia,"
    *WTVR*, May 28, 2021, *updated* May 29, 2021 [14], and 45 reported infections, Marie K
    Tomlin, "Governor Bans All Events Over 100 People, Coronavirus Cases Up to 45 in
    Va.," *WJJS*, March 15, 2020, at a time assessed to be a low risk, Staff, "Alexandria
    Health Department Confirms First 'Presumptive Positive' Case of COVID-19," *City of
    Alexandria*, March 14, 2020[15], there was sufficient cause found to justify a lockdown
    response that by the time nonessential social gatherings had been prohibited for ten
    persons or more, Maia Stanley (Capital News Service), " Northam orders public
    gatherings limited to 10," *Fauquier Now*, March 17, 2020, would provide the direct and
    proximate cause for unemployment claims catapulting from from  2,706 claims to 46,885.
    Laura Peters, "Study projects Virginia unemployment to nearly double by the summer
    due to COVID-19," *Business Leader*, March 25, 2020, cumulatively determined to be the
    equivalent of a Hurricane Katrina in every state.  Mike Allen, "Axios PM," *Axios*, April
    2, 2020; *see also* Tom Dempsey, Kolbie Satterfield & Kyley Schultz, "These 5 areas of
    Northern Virginia say they aren't ready to reopen yet, despite Northam's plan," *WUSA9*,
    May 9, 2020. ("Mayor Justin Wilson of Alexandria, who co-signed the letter, said that
    after the city saw a 400% rise in unemployment since February, he knew businesses in the
    area were eager to reopen.").

67. The impact upon the schools developed swiftly, after "Governor Northam declare[d] a
    state of emergency due to COVID-19" on March 12, 2020, "[a]ll K-12 schools in Virginia

---

[14] "Saturday, March 14, 2020: Virginia records its first COVID-19 death when a James City County man in his
70s died in the hospital." *Id.*
[15] "If you visited the Immanuel Chapel between February 26 and March 4 and were not contacted directly by
AHD and asked to self-quarantine, you may have been exposed to the virus but are considered by the CDC to be
at low risk." *Id.*

ordered to close for a minimum of two weeks" on March 13, 2020 and by March 23,

2020, "Governor Northam announced public schools would remain closed for the rest of

the school year", simultaneously announcing that "businesses like bowling alleys, gyms,

and theaters, would close due to the outbreak", with "Restaurants ordered to close dining

rooms." on March 24, 2020. Scott Wise, "A timeline of the COVID-19 pandemic in

Virginia," *supra.*

**68.** By issue of a warning, national public health authorities have at a minimum

acknowledged a risk associated with the vaccines, but a risk no less substantial than the

original presentation of COVID-19 within China and the response after its arrival was

more than just a published warning.

**69.** The staged dosage administration for the vaccines acknowledge the fact that a simple

introduction of the pathogen is insufficient to cause the human immune response system

to develop a response sufficient to repel an infection, but with no known infectious dose,

it was impossible for vaccine manufacturers to determine exactly how much greater than

immune response would be required; hence, from the outset, it was known that the

vaccine would be ineffective, even if efficacious, from preventing an infection from

COVID-19, and under DHS, 591 U.S., at ___ (citation omitted), "[j]udicial review of

agency action. . . is limited to 'the grounds that the agency invoked when it took the

action'", nor has a reason been articulated as to why, in a legitimate state interest, any

percentage of the population would be required to volunteer for an ineffective vaccine to

address a pathogen that, under its pathology, and under both the *Emergency Use*

*Authorization* and the *Defense Production Act*, would have to be a biological agent being

deployed against a target of national security interest, and rendering its distribution not

for those purposes, an unauthorized commitment under the Federal Acquisition

Regulations. FAR § 1.602-3.

*Enjoining Chilling Effect on Free Speech*

70. Pursuant to 18 U.S.C. § 242, "[w]hoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States. . . or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both", yet Respondents Mark R. Warner, Timothy M. Kaine, and Donald S. Beyer, Jr. have permanently suspended Petitioner's ability to post comment upon the designated public forums on their official Facebook pages, while Justin M. Wilson and Mark R. Herring have done so intermittently for brief periods to silence alternative viewpoints.

71. During the public health crisis, social media platforms LinkedIn, a wholly owned subsidiary of Microsoft, and Twitter, Inc., under the pretext of controlling information and preventing misinformation regarding COVID-19, have permanently suspended Petitioner's accounts, while Facebook, Inc., has subjected Petitioner's access to multiple suspensions, for periods of up to 30 days, during the public health crisis, with three nearly back-to-back 30-day suspensions in the past three months, using alleged inappropriate conduct dating back to November 2020, and with alleged offensive conduct from periods overlapping and prior to previous suspensions used as the basis for imposing the sanction, depriving Petitioner of any conception of fair notice.

72. Akin to businesses that have been encouraged to be the enforcers of noncompulsory vaccinations, as well as agents of the State in compelling compliance with facial coverings mandates, social media platforms, such as Facebook, Inc., Twitter, Inc. and LinkedIn have become essentially "thought police" to cancel out messaging content that departs from or dissents to the official positions promoted by the State.

*Enjoining Racketeering Activity*

73. Pursuant to Va. Code § 18.2-500(B), "[w]henever a person shall duly file a civil action in the circuit court of any county or city against any person alleging violations of the provisions of § 18.2-499 and praying that such party defendant be restrained and enjoined from continuing the acts complained of, such court shall have jurisdiction to hear and determine the issues involved, to issue injunctions *pendente lite* and permanent injunctions and to decree damages and costs of suit, including reasonable counsel fees to complainants' and defendants' counsel."

74. Additionally, under 18 U.S.C. § 1514(a)(1), [a] United States district court, *upon application of the attorney for the Government*, shall issue a temporary restraining order prohibiting harassment of a victim or witness in a Federal criminal case *if the court finds, from specific facts shown by affidavit or by verified complaint, that there are reasonable grounds to believe that harassment* of an identified victim or witness in a Federal criminal case exists or that such order is necessary to prevent and restrain an offense under section 1512 of this title, other than an offense consisting of misleading conduct, or under section 1513 of this title." (emphasis added)

## *RICO Act*

75. Pursuant to 18 U.S.C. § 1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section".

76. Under 18 U.S.C. § 1961(1)(B), racketeering activity may include: violations of "section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), . . . section 1951 (relating to interference with commerce, robbery, or

extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), . . . section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), . . . sections 175–178 (relating to biological weapons), [or] sections 229–229F (relating to chemical weapons)", and under 18 U.S.C. § 1961(G) may include "any act that is indictable under any provision listed in section 2332b(g)(5)(B)".

77. Pursuant to 18 U.S.C. § 175(a), "[w]hoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both", and, by use of the *Emergency Use Authorization* and the *Defense Production Act*, it has been established that 2019-nCoV, alternatively SARS-CoV-2, the agent cause for COVID-19, is a biological agent being deployed against a target of national security interest.

78. Pursuant to 18 U.S.C. 2332b(G)(5)(B)(i), "the term 'Federal crime of terrorism' means an offense that. . . is a violation of. . . 175 or 175b (relating to biological weapons)", as described above, "930(c) (relating to killing or attempted killing during an attack on a Federal facility with a dangerous weapon), as in the Rose Garden deployment of the agent, 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad)," as in the infections of foreign leaders, "1114 (relating to killing or attempted killing of officers and employees of the United States)", as in the infections of members of Congress, the Secret Service and other federal government employees, "1116 (relating to murder or manslaughter of foreign officials, official guests, or internationally protected persons)", as aforementioned, "1361 (relating to government property or contracts)", as in

contracts to develop and acquire COVID-19 vaccines, "1751(a), (b), (c), or (d) (relating to Presidential and Presidential staff assassination and kidnaping)", as in the infection of the former President, "2155 (relating to destruction of national defense materials, premises, or utilities), [and/or] 2156 (relating to national defense material, premises, or utilities)," as in the simultaneous infections aboard the *U.S.S Theodore Roosevelt* and the *U.S.S. Ronald Reagan*, "2332 (relating to certain homicides and other violence against United States nationals occurring outside of the United States), 2332a (relating to use of weapons of mass destruction), 2332b (relating to acts of terrorism transcending national boundaries)," as in the pandemic pathogen that lacked the infectiousness to be validated as an infectious disease being transmitted from person to person that resulted in the infections of over 33 million Americans and over 600,000 fatalities, over half of whom were the elderly in nursing homes, a known fatality risk from the beginning and for whom world public health authorities had recommended resources to protect early in the crisis, " 2339 (relating to harboring terrorists), 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations), 2339C (relating to financing of terrorism), [and/or] 2339D (relating to military-type training from a foreign terrorist organization)", as in permitting terrorists free range for over a year to produce the socioeconomic harms incurred by businesses, schools, churches, families and American citizens.

79. In furtherance of said conspiracy, State Attorney General Mark M. Herring, on the behalf and behest of Governor Ralph S. Northam did, in violation of 18 U.S.C. § 1512, predicate offenses, evade a summons to appear as defendants in *Webb v. Northam*, Case Number CL20001624 (Alexandria Cir. 2020), as well as in *Webb v. Northam*, Civil Number Civil Action No. 3:20CV497 (E.D.Va. 2020), *on appeal Webb v. Northam*, Record Number 20-

1968 (4th Cir. 2020), actions brought to challenge the lockdowns and facial coverings mandates, respectively.

80. Strong circumstantial evidence supports the inference that the same did, during the course of those litigations, in violation of 18 U.S.C. § 1503, a predicate offense, engage in "corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any. . . officer in or of any court of the United States, . . . in the discharge of his duty, . . . . or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice", resulting in the dismissals of these actions in the trial courts, and their remaining undecided still on appeal.

81. Similar conduct, in violation of 18 U.S.C. § 1503, arises in the matter of *Webb v. State Board of Elections*, Case No. CL20-2459-00 (Richmond Cir. 2020), *removed In Re: Major Mike Webb*, Case Number 20-1997 (4th Cir. 2020), litigation brought to gain access to the ballot as a candidate under a pandemic exemption that had been recognized in *Omari Faulkner for Virginia, et al. v. Virginia Department of Elections, et al.*, Case No. CL-20-1456 (Richmond GDC. 2020), *on appeal Omari Faulkner for Virginia, et al. v. Virginia Department of Elections, et al.*, Case No. VLW 020-8-024 (Richmond Cir. 2020), but, in disparate treatment, denied to Petitioner, denying the free speech right acknowledged in *Buckley v. Valeo*, 96 S.Ct. 612, 46 L.Ed.2d 659 (1974), and representing a chilling effect on free speech on the issues raised by the public health crisis, litigations not even mentioned by the Attorney General in his press release that appeared in Blue Virginia in late August 2020. AG Herring Press Release, "Attorney General Herring Again Successfully Defends Virginia's COVID Safety Measures," *Blue Virginia*, August 24, 2020 ("This is at least the fifteenth decision Attorney General Herring and his team

have won in defense of the Commonwealth's COVID mitigation efforts that were put in place to prevent the spread of the virus and keep Virginians and their families and communities safe and healthy.").

82. In violation of 18 U.S.C. § 1513(e), strong circumstantial evidence, under *U.S. v. Climico*, No. S2 11 CR. 974-08 CM, 2014 WL 4230320, at *1–7 (S.D.N.Y. Aug. 7, 2014) and under *U.S. v. Heard,* 709 F.3d 413 (5th Cir. 2013), supports the inference that the Attorney General and the Governor did engage in conduct that "knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense," in the inability of a paralegal with over 15 years of experience to obtain gainful employment, since January 2016.

83. In violation of 18 U.S.C. § 1513(e), strong circumstantial evidence further supports the inference that the Attorney General and the Governor did engage in conduct in which one or both did "knowingly engage[] in any conduct and thereby cause[] bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate, upon evidence that Petitioner's apartment residence fell victim to a home invasion in which the lightbulb was surreptitiously removed from a ceiling fan, as in evidence at Exhibit **D**, while the apartment maintenance did neglect for over four months to repair the same.

84. Such unlawful conduct raises claims under common law conspiracy, as well as claims under Commonwealth statutes Va. Code §§ 18.2-499 to 500, particularly through undue influence exerted upon state and local agencies that engaged to exact a personal property tax for a vehicle that Petitioner did not own, as in evidence at Exhibit **E**, as well as an insurance surcharge for the same, and a delay in the titling an registration of Petitioner's

automobile, as in evidence at Exhibit **F**, which was subjected to towing immediately after his visit to the Covington office of the Department of Motor Vehicles to file a complaint, as in evidence at Exhibit **G**, but was performed in furtherance of a broader scheme that resulted in the unchallenged ability of Respondents to engage in fraudulent misrepresentations regarding the public health crisis with the intent, and result of altering the outcome of an election, or electoral fraud, in addition to voter intimidation against particularly African Americans, Latinos and the elderly in nursing homes, most adversely impacted by the public health crisis, in violation of 18 U.S.C. § 594.

85. Strong circumstantial evidence of undue influence exists in several instances, to include the following:

### *Webb v. SBE*

86. In a hearing on an emergency motion to compel the issue of a writ of mandamus in the matter *Webb v. State Board of Elections*, *Webb v. State Board of Elections*, Case No. CL20-2459-00 (Richmond Cir. 2020), the Office of the Attorney General did, after refusal to accept service of process or waiver, did dispatch Assistant Attorney General Robert B. McEntee, III, to present a reply offered in a patent fraud upon the court, averring, inapplicably, the doctrines of *res judicata* and *laches* to prevent the Court from recognizing an exemption to the statutory signature requirement that had been extended to similarly situated others during that election year.

87. McEntee did, further, on the primary election day, the day upon which the hearing was held, appear in the otherwise empty courtroom, with two additional attorneys, including Carol Lewis, the designated attorney for the State Board of Elections, to argue on a minor motion regarding Petitioner's appearance on the ballot, the cost of which had been requested, under the *Virginia Freedom of Information Act*, Va. Code § 2.2-3700 *et seq.*, but which is yet to have found reply.

**88.** Having served as the childhood protégé to legendary civil rights and criminal defense attorney Raymond A. Brown, Esq., Petitioner has been acquainted with courtrooms since childhood, and, this was the first instance in which he witnessed a judge appear to be intimidated, even apologetic, to an attorney, in his courtroom.

### *Webb v. Northam (Lockdown)*

**89.** Immediately after the filing of a *FOIA* request to determine if the Virginia Department of Health or the Governor had ever, to counter the doctrinal surreptitious deployment of biological agents, attempted to invalidate that rebuttable presumption, or if at any time thereafter had conducted an in-progress-review to determine if the pathogen had been weaponized, which the reply indicates did not occur, as in evidence at Exhibit **H**, the Office of the Attorney General did file motion to dismiss the matter, *Webb v. Northam*, Case Number CL20001624, for failure to prosecute, well within the prerogative of the Court to have done *sua sponte*, especially in a matter about which the defendants had claimed lack of notice, despite admission, as in evidence at Exhibit **I**, of receipt of at least 40 emails on the topic from Petitioner.

**90.** Upon dismissal, the Court did ignore a praecipe duly filed at the time of commencement of the action to conclude that Petitioner had not engaged in a due diligence effort to serve the defendants, dismissing the case, with prejudice.

### *Webb v. Northam (Facial Coverings)*

**91.** *Webb v. Northam*, Civil Number Civil Action No. 3:20CV497 (E.D.Va. 2020), *on appeal Webb v. Northam*, Record Number 20-1968 (4th Cir. 2020) was subjected to an administrative order, piercing the veil of judicial immunity, to amend the initial complaint, filed on June 2, 2020, requesting that Petitioner remove material that was deemed extraneous and irrelevant.

**92.** The Amended Complaint, with no entry of appearance by the defendants, for whom a praecipe directing the United States Marshal to perfect service of process had been filed simultaneously with the original complaint, was dismissed on August 25, 2020, and has remained on appeal at the Fourth Circuit since that time.

**93.** Moreover, during the relevant time, may the Court take judicial notice that, in accordance with Fed.R.Crim.Pro. 6(a), no mandatory grand jury has been convened.

### *FOIA* Writ of Mandamus

**94.** By letter, dated January 8, 2021, Petitioner submitted a request for information under the *Freedom of Information Act (FOIA)*, 5 U.S.C. § 552 to request from "the Centers for Disease Control and Prevention, as well as the National Institutes for Allergy and Infectious Diseases," copies of any and all documents relating to the exact infectious dose and secondary attack rate so as to merit COVID-19 being described as a "highly contagious disease", or even an "infectious disease," as required under Va. Code § 44-146.17, for the authority to impose executive orders in furtherance of the COVID-19 response", as in evidence at Exhibit **J**, which was forwarded by email to niaidnews@niaid.nih.gov and qmq9@cdc.gov on January 11, 2021, as in evidence at Exhibit **K**, and placed in First Class Mail, but, to date, no reply has issued.

**95.** In addition, on January 8, 2021, a forum was hosted by the Virginia Department of Health, at which "[o]nce registered, . . . [registrants were permitted to] submit questions in advance for the panelists", Staff, "Public invited to hear Dr. Anthony Fauci — COVID-19 expert and special guest of 'Facts and Faith Fridays'," *VCU Health*, January 5, 2021, and Petitioner duly submitted a question regarding infectious dose and secondary attack rate, which found no response.

**96.** Petitioner will concede that the parcels may have been lost in the mail. *See e.g.*, Danielle Wallace, "USPS worker charged with dumping ballots, as mail carriers perform extra

trips before Election Day," *Fox News*, October 28, 2020. *See also* Major Mike Webb,

"Letters of the Law: Postage Due," *YouTube*, July 27, 2017,

https://youtu.be/Ywp8bgBi8GM; Exhibit **L**.

97. However, by email, dated March 23, 2021, the White House did acknowledge receipt of a

request for information to determine whether or not the infectious dose, which has yet to

have been determined, and the secondary attack rate, not even identified by the Centers

for Disease Control and Prevention that has stated such a value for other highly

contagious diseases, like measles, small pox and chicken pox on its website, were

classified information, which could only be done, under Executive Order 12958,

*Classified National Security Information*, April 17, 1995, if COVID-19 was the property

of the Government, for which some reply should have issued not later than March 20,

2021, but, to date, has found no response.

### Fraud

#### *Doctor Fauci*

98. Anthony S. Fauci, M.D., has described the infections that occurred at the Rose Garden as

a super spreader event, Stephen Nelson, "Anthony Fauci calls Rose Garden Amy Coney

Barrett event a 'super spreader'," *New York Post*,  October 9, 2020, which scientists have

recognized since the 1980s would require a pathogen that was highly contagious, such as

measles, Derek R. MacFadden, & Wayne L. Gold, *Measles*, 186 CMAJ 6, April 1,

2014("Measles, with an attack 90% attack rate, is one of the most infectious viruses

harmful to man."); Staff, "Measles (Rubeola):  For Healthcare Professionals," *CDC*,

February 5, 2018, https://www.cdc.gov/measles/hcp/index.html (accessed September 26,

2020) ("Measles virus can remain infectious in the air for up to two hours after an

infected person leaves an area."); *see also* Staff, "Transmission of Measles," *CDC*,

February 5, 2018,  https://www.cdc.gov/measles/transmission.html (accessed August 20,

2020), or 60% infectious small pox, *Staff*, "Chickenpox (Varicella): For Healthcare

Professionals," *CDC*, December 31, 2018,

https://www.cdc.gov/chickenpox/hcp/index.html (accessed August 29, 2020) or a

pathogen with a low infectious dose, like tuberculosis, which only requires the successful

transfer of only ten bacilli. Yayehirad A. Melsew, *The role of super-spreading events in*

*Mycobacterium tuberculosis transmission: evidence from contact tracing*, 19 BMC

Infectious Diseases 244 (2019), https://doi.org/10.1186/s12879-019-3870-1.

99. Fauci knows, or should have known, that, since the 1980s the medical community has

recognized a validated highly contagious pathogen, or a pathogen with a low infectious

dose was a *sine qua non* element required to set off a super spreader event. *See* Martin J.

Blaser & Lee S. Newman, *A Review of Human Salmonellosis: I. Infective Dose*, *supra*,

rendering these statements a misrepresentation of a material fact, known to be false, with

intent to mislead, with the damage, in detrimental reliance, contributing to the popular

misconception that COVID-19 was a highly infectious disease, adversely impacting

Petitioner's efforts, particularly as a candidate for office, to present the truth, delaying the

resolution of the public health crisis, and resulting in over 70% of Virginia residents

volunteering for at least one dose of a vaccine that was developed with no conception of

the infectious dose it was supposed to prevent.

100.    Dr. Fauci, has referred to to the risk associated with COVID-19 as "highly

contagious", Phillip Bump, "Fauci, unchained," *Washington Post*, January 21, 2021, a

subjective and normative claim that runs afoul of the positive, empirical findings

validated by credible large sample size studies, raising a reasonable suspicion regarding

reports of a single pathogen that is alleged to possess a widely variable secondary attack

rates, none of which attain the threshold for a "highly contagious disease," *see* K. Shah,

D. Saxena & D. Mavalankarwhich, *Secondary attack rate of COVID-19 in household*

*contacts: a systematic review*, QJM: An International Journal of Medicine, pp. 841-850. July 29, 2020, doi: 10.1093/qjmed/hcaa232 (case review finding variable range for secondary attack rate between 4.6% and 49.56%), as well as a variable presentation regarding shedding of viral load, Francois-Xavier Lescure, *et al.*, *Clinical and virological data of the first cases of COVID-19 in Europe: a case series*, 20 Lancet Infect. Dis., pp. 697-706, March 27, 2020, https://doi.org/10.1016/S1473-3099(20)30200-0 (case study involving five patients, "three men (aged 31 years, 48 years, and 80 years) and two women (aged 30 years and 46 years), all of Chinese origin, who had travelled to France from China around mid-January, 2020", admitted to Bichat-Claude Bernard University Hospital (Paris, France) and Pellegrin University Hospital (Bordeaux, France), and diagnosed with COVID-19, and finding viral load shedding conforming to "three different clinical and biological types of evolution: first, mild cases through two paucisymptomatic patients aged younger than 50 years who were diagnosed early, with high viral load in nasopharyngeal samples, suggesting a significant shedding of SARS-CoV-2, reflected by virus detection by RT-PCR; second, two young patients presenting with mild symptoms at admission and experiencing a secondary progression to pneumonia and severe disease by days 10–11; and third, an older patient with a rapid evolution towards critical disease with multiple organ failure and a long and sustained persistence of SARS-CoV-2 nasopharyngeal detection associated with viral RNA detection in multiple sites, including blood."). *But see* Yong-Hoo Lee, *et al.*, *Clinical Course of Asymptomatic and Mildly Symptomatic Patients with Coronavirus Disease Admitted to Community Treatment Centers, South Korea*, 26 Emerg. Inf. Dis. 10, pp. 2346-2352 (October 2020), https://doi.org/10.3201/eid2610.201620 ("data might be helpful for planning isolation centers and formulating self-isolation guidelines for the public" and finding that a "recent study that analyzed the viral dynamics of 76

hospitalized patients reported that severe COVID-19 cases tended to have viral loads ≈60 times higher than mild cases, with a longer viral shedding period", associated with a "longer virologic remission").

101.    There is no legitimate state interest in the distribution, sale or purchase of medical treatments, such as vaccines, that are not validated as effective to prevent a harm, nor any legitimate state interest in failing to disclose to the American public for over a year that a pathogen that could only have been the product of the virology laboratory in Wuhan that, by infectiousness, could only have been deployed, to have infected over 33 million Americans.

### ***Doctor Northam***

102.    Ralph S. Northam, M.D., similarly, has repeatedly referred to the risk associated with COVID-19 as "highly contagious", *see* Tyler Arnold, "Northam extends Virginia's COVID-19 restrictions," *Washington Examiner*, January 28, 2021 ("'While the end of this pandemic is finally in sight, the virus is still spreading, including several highly contagious variants, and now is not the time to let up on preventative measures,' Northam said in a statement.").

103.    There is no legitimate state interest in the distribution, sale or purchase of medical treatments, such as vaccines, that are not validated as effective to prevent a harm, nor any legitimate state interest in failing to disclose to the American public for over a year that a pathogen that could only have been the product of the virology laboratory in Wuhan that, by infectiousness, could only have been deployed, to have infected over 33 million Americans.

### ***Dr. Walensky***

104.    Recent news reports state:

> Centers for Disease Control and Prevention Director Rochelle Walensky issued her gravest warning yet Thursday about the highly contagious Delta

variant, which has driven a sharp increase in new Covid-19 cases across the country.

Nearly 25 percent of new infections have been linked to Delta, she said, up from 6 percent in early June.

"Looking across the country we have made incredible progress," Walensky said during a press briefing Thursday. "However, looking state by state and county by country it is clear communities where people remain unvaccinated are communities that are vulnerable. I expect that in the coming weeks the [Delta] variant will eclipse the Alpha variant." Erin Banco, Adam Cancryn & Dan Goldberg, "Delta variant is growing threat to unvaccinated people," *Politico*, July 1, 2021.

105.   Recent news reports state:

The highly transmissible Covid-19 variant that first emerged in India is rapidly spreading around the world, health authorities say, intensifying the race to increase global vaccinations.

The B.1.617.2 variant, now dubbed the Delta variant, is in at least 60 countries, including the U.S. and the U.K., and British scientists recently estimated that it might be 40% to 50% more transmissible than the B.1.1.7 variant, or Alpha, which in turn is more transmissible than the original virus and quickly spread across the globe.

"Given that level of transmissibility, I would anticipate that it would actually spread around the world," Sharon Peacock, executive director and chair of the Covid-19 Genomics UK Consortium, said at The Wall Street Journal's Tech Health Event on Wednesday.

In the U.K., the Delta variant is rapidly displacing the Alpha variant, and health officials believe that it is contributing to an uptick in Covid-19 cases and hospitalizations in the country, though it is starting from a low baseline. Previously, around 98% of cases in the U.K. were due to the Alpha variant, but the Delta variant has started to take over after being introduced into the country in March and now constitutes about 75% of cases, Dr. Peacock said. Covid-19 Genomics UK is a consortium of public-health and academic organizations that collects, sequences and analyzes genomes from Covid-19 tests in the U.K. to guide pandemic response efforts. Brianna Abbott, "Covid-19 Delta Variant First Found in India Is Quickly Spreading Across Globe," *WSJ*, June 9, 2021.

106.   A validated less than five percent infectious pathogen that had increased

transmissibility by half its current infectiousness would still only by 7.5% infectious, an

accuracy mocked as professionally embarrassing for marksmanship, *see* Christal Hayes,

"Cops Fired 40 Shots During Scalise Baseball Shooting, Only 3 Hit Gunman,"

*Newsweek*, October 16, 2017, and still not satisfying the threshold of an infectious, much less highly contagious pathogen. *See* Julia Belluz, "China's cases of Covid-19 are finally declining. A WHO expert explains why," *supra* ("In flu, you'll find this virus right through the child population, right through blood samples of 20 to 40 percent of the population.").

107.    There is no legitimate state interest in the distribution, sale or purchase of medical treatments, such as vaccines, that are not validated as effective to prevent a harm, nor any legitimate state interest in failing to disclose to the American public for over a year that a pathogen that could only have been the product of the virology laboratory in Wuhan that, by infectiousness, could only have been deployed, to have infected over 33 million Americans.

108.    Both the preliminary report, Mark G. Thompson, *et al.*, *Interim Estimates of Vaccine Effectiveness of BNT162b2 and mRNA-1273 COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Health Care Personnel, First Responders, and Other Essential and Frontline Workers — Eight U.S. Locations, December 2020–March 2021*, MMWR, *see also* Tom Shimabukuro, "COVID-19 vaccine safety update Advisory Committee on Immunization Practices (ACIP)," *CDC COVID-19 Vaccine Task Force Vaccine Safety Team*, March 1, 2021 ("Disclaimer: The findings and conclusions in this report are those of the authors and do not necessarily represent the official position of the Centers for Disease Control and Prevention (CDC) or the U.S. Food and Drug Administration (FDA)"), as well as the most recent report, Jill Diesel, *et al.*, *COVID-19 Vaccination Coverage Among Adults — United States, December 14, 2020–May 22, 2021*, 70 MMWR 25, pp. 922-927, June 25, 2021, DOI: http://dx.doi.org/10.15585/mmwr.mm7025e1, purport to represent vaccine effectiveness, but are sample biased studies conducted with no knowledge of the infectious dose the vaccines were developed to prevent.

109.    The predominant, two-dose administration for the vaccines acknowledges that fact that the simple introduction of the pathogen or a cognate may be insufficient to trigger the appropriate level of immune response to counteract an infection, and, under the *Emergency Use Authorization*, vaccine developers were only required to establish sufficient assurances regarding safety and efficacy, not prevention.

110.    The low fomite transmission risk, as well as the nonexistence of an outdoor risk of infection suggest that the infectious dose is extraordinarily high, as demonstrated in the Chinese restaurant case study, Jianyun Lu, *et al.*, *COVID-19 Outbreak Associated with Air Conditioning in Restaurant, Guangzhou, China, 2020*, 26 Emerg. Inf. Dis. 7 (July 2020), used by 239 scientists to advocate for a modification of the transmission model from droplet transmission to aerosol transmission. Lidia Morawska & Donald K. Milton, *It is Time to Address Airborne Transmission of COVID-19*, Oxford University Press for the Infectious Diseases Society of America, July 10, 2020; Linsey C. Marr, "Yes, the Coronavirus Is in the Air," *NYT*, July 30, 2020.

111.    After the publication of the recommendation, Petitioner specifically made an inquiry to Linsey C. Marr, one of the co-authors for the recommendation, to inquire about how the findings suggested a potential for COVID-19 to have been weaponized, but, to date, there has been no reply, as in evidence at Exhibit **M**, similar to the nonresponsiveness by Mark R. Warner, when Petitioner submitted an intelligence estimate regarding the variant migration pattern that had been early detected in *WHO Situation Report No. 3*, dated January 23, 2020. *See* Major Mike Webb for Congress, "Warner Pandemic Report: Director's Cut," *YouTube*, March 27, 2020, https://youtu.be/iZlNrCariEc.

112.    There is no legitimate state interest in the distribution, sale or purchase of medical treatments, such as vaccines, that are not validated as effective to prevent a harm, nor any legitimate state interest in failing to disclose to the American public for over a year that a

pathogen that could only have been the product of the virology laboratory in Wuhan that, by infectiousness, could only have been deployed, to have infected over 33 million Americans.

### *Pfizer, Moderna and Johnson & Johnson*

113.   With a captive market, the pharmaceutical companies have been placed in an advantageous position to market the product that was developed under the *Emergency Use Authorization* and delivered under the *Defense Production Act*, an unauthorized commitment, and have utilized promotions by government officials regarding the infectiousness of the disease in normative terms that contrast with the empirical validation, as well as the promotions by government officials regarding the alleged effectiveness, as opposed to efficacy, of the vaccines as a treatment to prevent infection from COVID-19, resulting in over 70% of Virginians volunteering, without a government mandate, to be administered the vaccine, and creating a hostile environment for those who chose to resist.

114.   There is no legitimate state interest in the distribution, sale or purchase of medical treatments, such as vaccines, that are not validated as effective to prevent a harm, nor any legitimate state interest in failing to disclose to the American public for over a year that a pathogen that could only have been the product of the virology laboratory in Wuhan that, by infectiousness, could only have been deployed, to have infected over 33 million Americans.

### **Prayer for Relief**

115.   In declaratory relief, Petitioner prays the Court issue the following declarations: a) that COVID-19 has not been validated as an infectious disease; b) that COVID-19 has not been validated as a highly contagious disease; c) and that the COVID-19 vaccines have only been approved for efficacy and not effectiveness.

116.   In declaratory relief, Petitioner prays the Court, in a facial challenge, declare the COVID-19 response involving social distancing, wearing nonmedical grade facial covering that has not been validated to be effective and complying with guidance to be administered vaccines in violative of the Constitution, depriving citizens of their free exercise rights as well as in violation of the *Establishment Clause*, creating a secular church of the state.

117.   In declaratory relief, and in the alternative, Petitioner prays the Court, in an as applied challenge, for persons with a sincerely held faith belief, like Petitioner, regarding the sanctity of life and opposition to abortion, declare the COVID-19 response involving social distancing, wearing nonmedical grade facial covering that has not been validated to be effective and complying with guidance to be administered vaccines in violative of the Constitution, depriving citizens of their free exercise rights as well as in violation of the Establishment Clause, creating a secular church of the state, or at least imposing a violation of their rights to equal protection, being discriminated against because of their religious beliefs, in disparate treatment from similarly situated others.

118.   In injunctive relief, Petitioner prays the Court enjoin: a) Pfizer, Inc., ModernaTX, Inc., Johnson & Johnson, Inc., Anthony S. Fauci, the National Institute for Allergy and Infectious Disease, Rochelle Walensky, the Centers for Disease Control & Prevention, Janet Woodcock, the Food & Drug Administration, Ralph S. Northam, Mohammed Norman Oliver and the Virginia Department of Health from advertising or selling the COVID-19 vaccines as a measure to prevent, mitigate, treat or cure any disease or illness, and refrain from characterizing the disease as "highly contagious" or the vaccines as "effective", in the absence of clinical and empirical data that is quantifiable.

119.   In injunctive relief, Petitioner prays the Court enjoin the University of Virginia from making vaccinations compulsory for matriculating students.

120.   In injunctive relief, Petitioner prays the Court enjoin the policy requiring unvaccinated persons to don facial coverings validated as ineffective by the National Institutes for Occupational Safety and Health over a decade ago and imposing a stigma of being unsafe, presenting a risk of infecting others with a less than five percent infectious pathogen with a 1.8% case fatality rate.

121.   In injunctive relief, Petitioner prays the Court enjoin Pfizer, Inc., ModernaTX, Inc., and Johnson & Johnson, Inc., from the manufacture, sale and distribution of the COVID-19 vaccines to prevent a disease that has not been validated as infectious and with vaccines that have not been validated to be effective, especially in the absence of any knowledge regarding the infectious dose.

122.   In injunctive relief, Petitioner prays the Court enjoin Facebook, Inc., Twitter, Inc., and LinkedIn, a wholly owned Microsoft subsidiary from suspending his social media accounts, depriving a candidate of a free speech right to express a valid point of view on a topical issue of the day.

123.   In injunctive relief, Petitioner prays the Court enjoin Donald S. Beyer, Jr., Timothy M. Kaine, Mark R. Warner, Mark R. Herring and Justin M. Wilson from blocking his comments on their official social pages, designated public forums, depriving a candidate of a free speech right to express a valid point of view on a topical issue of the day.

124.   In injunctive relief, Petitioner prays the Court, in cooperation with the U.S. Attorney, pursuant to under 18 U.S.C. § 1514(a)(1), afford such protections as deemed required from retaliation.

125.   Under the *RICO Act*, Petitioner prays the Court will find that Respondents Ralph S. Northam and Mark R. Herring have committed sufficient predicate offenses to substantiate a pattern of racketeering, and, pursuant to 18 U.S.C. § 1964, award treble damages.

126.     Under Va. Code § 18.2-500, Petitioner prays the Court will find that Respondents Ralph S. Northam and Mark R. Herring have engaged in conduct in violation of the business conspiracy statute and award treble damages.

127.     Under Va. Code § 18.2-499, Petitioner prays the Court will find that Respondents Ralph S. Northam and Mark R. Herring have engaged in conduct in violation of the civil conspiracy statute and award appropriate damages.

128.     Under a theory of common law conspiracy, Petitioner prays the Court will find that Respondents Ralph S. Northam and Mark R. Herring have engaged in conduct in such unlawful conduct and award appropriate damages.

129.     Under the *Freedom of Information Act*, Petitioner prays the Court will compel the Office of Management and Budget to reply to the request for information acknowledged as accepted on March 23, 2021, requesting information as to whether or not the infectious dose and secondary attack rate for COVID-19 was classified information.

130.     Petitioner prays the Court find that Anthony S. Fauci did fraudulently misrepresent the level of risk associated with COVID-19 by describing it as "highly contagious" and capable of setting off a super spreader event, placing Petitioner and others in detrimental reliance with regard to compliance with mandates and consent to the COVID-19 vaccines.

131.     Petitioner prays the Court find that Ralph S. Northam did fraudulently misrepresent the level of risk associated with COVID-19 by describing it as "highly contagious", placing Petitioner and others in detrimental reliance with regard to compliance with mandates and consent to the COVID-19 vaccines.

132.     Petitioner prays the Court find that Rochelle Walensky did fraudulently misrepresent the level of risk associated with COVID-19 by describing it as "highly contagious",

placing Petitioner and others in detrimental reliance with regard to compliance with mandates and consent to the COVID-19 vaccines.

133.    In accordance with 42 U.S.C. §§ 1983 and 1988, as well as the *Religious Freedom Restoration Act of 1993* [42 U.S.C. 2000bb et seq.], Petitioner prays the Court award attorney fees, and such other equitable relief as deemed appropriate.

134.    In accordance with Va. Code § 57-2.02(D), Petitioner prays the Court award attorney fees, and such other equitable relief as deemed appropriate.

135.    Under Va. Code § 8.01-271.1, "The signature of an attorney or party constitutes a certificate by him that (i) he has read the pleading, motion, or other paper, (ii) to the best of his knowledge, information and belief, formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and (iii) it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation," and, in conforming form, Petitioner presents this signed and sworn pleading to the Court. So help him God.

136.    I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

137.    I further declare under penalty of perjury that no attorney has prepared, or assisted in the preparation of this document.

**WHEREFORE**, Petitioner prays, for the reasons argued above, under penalty of sanction for vexatious or frivolous pleadings, Executive Order 63 will be declared unconstitutional in this as applied challenge, that the Court will award reasonable attorney's fees to recover the cost of seeking redress for the grievances noted above, and that the Court may

direct any and all other equitable relief deemed to be proper, in accordance with the

Court's good judgment and in the furtherance of justice.

All the above statements are true to the best of my knowledge, and I understand that a false statement in this Verified Complaint may subject me to penalties of perjury.

_____

Michael D. Webb, a/k/a Major Mike Webb
1210 S. Glebe Rd, #40391
Arlington, Virginia 22204
Phone: (856) 220-1354
Email: GiveFaithATry@gmail.com

Executed on: ___7-2-21___ (Date)

Subscribed, acknowledged and sworn to before me, the undersigned Notary Public in the

County of ___Arlington___, in the Commonwealth of Virginia, this

___2nd___ day of ___July___, 20_21_.

**CHRISTY RICHARDS**
NOTARY PUBLIC
Commonwealth of Virginia
Expires: 08/31/2022
ID #: 7056724

_____
NOTARY PUBLIC

My commission expires: ___08/31/2022___   Registration Number: ___7056724___

**Table of Exhibits**

| Exhibit | Description |
|---------|-------------|
| **A.** | Arlington Voters Against Mike Webb |
| **B.** | People Against Mike Webb |
| **C.** | Cached CDC Pages on Myocarditis |
| **D.** | Home Invasion Lightbulb |
| **E.** | Property Tax on Vehicle |
| **F.** | DMV Complaint |
| **G.** | Towing Charges |
| **H.** | FOIA VDH re: Weaponization |
| **I.** | Transcript of Hearing |
| **J.** | NIAID and CDC FOIA |
| **K.** | Email Forwarding FOIA |